# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Morton Denlow | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 98 C 4391 | **DATE** | 7/1/2003 |
| **CASE TITLE** | | Catherine Winfield vs. Jo Anne Barnhart | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. The Commissioner's motion for summary judgment [30-1] is granted and the Claimant's motion for summary judgment is denied. The decision of the Administrative Law Judge is affirmed.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | |
| | No notices required. | number of notices | **Document Number** |
| ✓ | Notices mailed by judge's staff. | JUL 07 2003 | |
| | Notified counsel by telephone. | date docketed | 34 |
| | Docketing to mail notices. | | |
| | Mail AO 450 form. | docketing deputy initials | |
| | Copy to judge/magistrate judge. | 6/30/2003 | |
| | | date mailed notice | |
| DK | courtroom deputy's initials | DK | |
| | | mailing deputy initials | |

03 JUL -2 AM 11: 55
CLERK, U.S. DISTRICT COURT
Date/time received in central Clerk's Office

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| CATHERINE WINFIELD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 98 C 4391 |
| v. | ) | |
| | ) | |
| JO ANNE B. BARNHART | ) | Magistrate Judge Morton Denlow |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

### I. INTRODUCTION

Claimant, Catherine Winfield ("Claimant"), seeks judicial review of the final decision of the Commissioner of Social Security ("Commissioner"), Jo Anne B. Barnhart, denying her application for a period of disability under § 216(i), disability insurance benefits under § 223 and supplemental security income under § 1614(a)(3) of the Social Security Act, as amended. This case comes to the Court on cross-motions for summary judgment. The Claimant raises the following issues: 1) whether the ALJ gave appropriate consideration to the opinions of the treating and examining physicians, and 2) whether the ALJ erred in finding that the Claimant did not meet the requirements of Commissioner's Listings 1.02, 12.02 and 12.05C. For the reasons stated below, the Claimant's motion for summary judgment is denied and the Commissioner's motion for summary judgment is granted.

34

## II. BACKGROUND

### A.    PROCEDURAL HISTORY

The Claimant filed her application for a period of disability, disability insurance benefits, and Supplemental Security Income on May 9, 1995, claiming that she was unable to work as of October 1, 1989 due to knee problems. R.78.  Claimant's application was denied initially and on reconsideration. R. 82, 86, 92, 95.  On January 3, 1997, Administrative Law Judge Stephen Templin ("ALJ"), held a hearing at which Claimant, two medical experts and a vocational expert testified. R. 34.  The ALJ denied Claimant's claims in a decision dated April 19, 1997.  R. 12-30.  The Appeals Council denied Claimant's request for review on June 10, 1998, R. 6-7a. Claimant filed a timely complaint for judicial review of the Commissioner's decision in this court on July 17, 1998. R. 468-69.

On July 25, 1998, the Claimant filed a second application for SSI benefits. R. 735-37. The Commissioner first denied the claim on December 14, 1998, and again on May 11, 1999. R. 662-64 . The Claimant filed a timely request for a hearing. R. 670.

When the Commissioner discovered that one of the audio tapes of the 1997 hearing had been lost and that a full transcript of the hearing could not be provided to the court, the Commissioner requested remand of the case in order to hold a new hearing on Claimant's claims.  On December 13, 1999, the Appeals Council vacated the final decision of the Commissioner and ordered a new hearing, pursuant to this Court's order of remand.  R. 465-66.

From March 2000 to July 2002, the ALJ held four hearings, took testimony from eight different medical experts, R. 319-443, and obtained the following medical evidence at the expense of the SSA: an internal medicine exam, R. 543-51, an orthopedic exam, R. 556-66, x-rays, R. 562, lab tests, R. 552-53, pulmonary function studies, R. 554-55, and two psychological evaluations, R. 567-81, 640-46. The ALJ admitted the evidence of treatment and evaluation submitted by the Claimant's attorney. R. 444-792. On August 29, 2002, the ALJ issued a decision denying Claimant's claims. R. 306-18. On February 18, 2003, the Commissioner filed a certified copy of the administrative record on remand with this Court. On February 24, 2003, the case was reopened. The case is now before the Court on cross-motions for summary judgment.

## B. CLAIMANT'S MEDICAL CONDITION

### 1. Claimant's Physical Condition

### a. Dr. Wesley Tabayoyong: Treating Physician

From December 1994 to December 1996, the Claimant had regular appointments with her primary care physician, Dr. Wesley Tabayoyong. R. 222-243. The 1997, x-ray that Dr. Tabayoyong took of her right elbow was normal. R. 511. In September and October of 1997, she saw Dr. Tabayoyong four times. R. 524-5.

On November 26, 1997, Dr. Tabayoyong filled out the Claimant's residual functional capacity evaluation ("RFC"). R. 290-4. He noted that she could stand or walk for two of eight hours with breaks, could sit for eight hours with breaks, could occasionally carry ten

pounds and could frequently carry five pounds. R. 290-1. He also noted that the Claimant had full range of motion in her knees and elbows. R. 297.

In October and November 1998, Claimant saw Dr. Tabayoyong for her knee and elbow arthritis, R. 525-6. She again went to Dr. Tabayoyong and Holy Cross Hospital in the Spring of 1999 because of knee pain seeking medication. R. 526-28, 607. She returned to Dr. Tabayoyong in September and November 1999, and February 2000. R. 529-33.

### b. Dr. Rochelle Hawkins: Consultative Physician of Internal Medicine

On August 14, 1995, Dr. Rochelle Hawkins, completed a consultative internal medical examination. R. 145-50. The Claimant reported constant pain in her elbows, shoulders, and wrist. R. 145. Dr. Hawkins determined that she did not have full range of motion in her knees, but that her gait was normal and that she did not need a device to ambulate. R. 147. An x-ray of her left knee showed minimal osteoarthritis. R. 150.

### c. Dr. Steven Radowitz: Consultative Physician of Internal Medicine

On October 1, 1998, Dr. Steven Radowitz, performed a consultative internal medicine examination. R. 781. Claimant reported bilateral knee and right elbow pain, and told Dr. Radowitz that she used a cane to walk. R. 781. She estimated that she could walk two hours in an eight hour day, and stand for one hour per eight hour day in five to ten minute intervals. R. 781. Dr. Radowitz found signs of probable osteoarthritis in Claimant's knees and right elbow and diagnosed her sickle cell trait as asymptomatic. R.783-84. Further, he found that

she had full range of motion in her knees and elbows, could stand or walk six hours of an eight hour day, could frequently lift 25 pounds and occasionally lift 50 pounds. R. 783, 786.

### d. Dr. Karen Leone: Consultative Physician of Internal Medicine

On March 23, 2000, Dr. Karen Leone, performed a consultative internal medicine examination. R. 542. The Claimant reported that she suffered from arthritis pain in her knees, right elbow and hands, could only walk one block without needing to rest and always used a cane to walk. R. 543. Dr. Leone found that the Claimant could walk at a normal pace for a hundred feet without a cane. R. 544. She also noted that the Claimant had full range of motion in all of her joints, could stand for 6 hours of an eight hour day, could frequently lift 25 pounds, and could occasionally lift 50 pounds. R. 546-8. Dr. Leone also performed pulmonary function tests, and found that Claimant's hypertension was controlled. R. 546, 554.

### e. Dr. Richard Shermer: Consultative Physician of Orthopedics

On April 6, 2000, Dr. Richard Shermer, an orthopedist examined the Claimant. R. 556-66. He diagnosed her with "bilateral knee chondromalacia with synovial bogginess and thickening and multifocal arthralgia." R. 563. He found that when the Claimant walked she showed "no instability and had good residual motion." R. 562. An x-ray report "indicated normal bones, joints and soft tissues for both knees." R. 562. Furthermore, he found that she could stand and walk for six hours of an eight hour work day, sit for the whole day, and frequently lift 25 pounds. R. 564-5.

5

**f. Additional Medical Examinations**

In 1989, following her left knee surgery, the Claimant had physical therapy which allowed her to ambulate on her own, with the expectation that she would return to her normal level of activity. R. 198.

In November 1995, a physician who filled out an "arthritic report" for Claimant's disability claim diagnosed her with arthritis of the knee and ankylosis of the right elbow. He further wrote that her ambulation was normal, and that her ability to perform work-related tasks was "unremarkable." R. 152.

In March 1996, the Claimant had an MRI showing joint effusion in her left knee. R. 253. In September 1996, an MRI of her right knee showed slight deformity of the lateral meniscus and minor degeneration of the patella. R. 161. On October 28, 1996, Claimant had arthroscopic surgery on her right knee. R. 48, 278.

An investigation of her right forearm in January 1997, by attending physician, Dr. Labanauskas, following her complaints of pain and numbness, revealed nothing abnormal. R. 273.

In November 1998, she went to Holy Cross Hospital for left knee pain. R. 609. In February 1999, she returned to the hospital complaining of joint pain. R. 609. In March 1999, she received an injection to reduce the pain in her left knee. R.608.

On January 13, 2000 the Claimant went to the emergency room because of left knee and right hip pain. R.606. An x-ray of her left knee showed some joint effusion. R. 536,

537, 539, 540, 612. The x-ray of her right hip was unremarkable. R. 538, 541, 542, 611.

The Claimant returned to the emergency room on October 10, 2000, for pain in her right knee. An MRI done on this knee on October 12, 2000 showed mild degenerative changes and a small patellar cyst. R. 610.

## 2. Claimant's Mental Condition

The Claimant began receiving mental health treatment from the Chicago Department of Public Health in May 1999. She received therapy every month or two, R. 624-34, 637-38, and received a one-year prescription of Prozac. R. 621.

### a. Dr. Norton Knopf: Consultative Psychologist

On April 14, 2000, Norton Knopf, Ph.D., performed a consultative psychological evaluation of the Claimant, R. 567, where he gave her both the Weschler Adult Intelligence Scale-3rd edition IQ tests ("WAIS-III") and the Minnesota Mutiphasic Personality Inventory MMPI-2nd edition("MMPI-2). R. 574-76. Claimant told Dr. Knopf that she saw a psychiatrist once a month for severe depression and severe anxiety. R. 569. On the WAIS-III, her full scale IQ fell within the mild mental retardation range, as the ninety-five percent confidence range for her IQ was between 64-72. R. 572-3. The test showed her verbal intelligence score of 73, R. 573, to be in the borderline range. R. 576. He found that her "fund of information was below [the] background and intellectual level" of a high school graduate. R. 570. Nonetheless, he found the test results to be "reliable and valid" given the Claimant's cooperative demeanor. R. 571-2.

7

Dr. Knopf did not find that her score on the MMPI-2 was reliable. He believed that it was possible that her score reflected an attempt to "fak[e] bad [results], an inadequate reading ability, psychotic thought processes, or a cry for help." R. 574-76. The score she received was most consistent with a schizophrenic diagnosis, paranoid type, a disorder for which the Claimant has no symptoms. R. 575. Dr. Knopf found that the Claimant's abuse of alcohol and marijuana were in remission. R. 576.

### b. Dr. David Paul Smith: Consultative Psychologist

On December 19, 2001, Dr. David Paul Smith performed a consultative psychological evaluation and administered the Luria-Nebraska Neuropsychological Battery. R. 644. At one point in the evaluation the Claimant "joked. . . that her mind is not what it used to be, probably due to all the drugs she used in the past," at another she told the doctor that she "dr[a]nk[] like a fish" but had not used cocaine since 1983. R. 644. The doctor, while noting that "her emotional and physical problems as well as her irritable and withdrawn disposition affected her ability to perform," found the scores on the test to still be a "reliable estimate of [Claimant's] current cognitive function." R. 645. The test showed a high likelihood that Claimant had brain dysfunction, but that "some of her performance [was] likely due to poor motivation, and low frustration tolerance and emotional difficulties related to characterological problems." R. 646. Dr. Smith also found that she may have performed poorly because of "educational deficits." R. 646.

### c. Dr. Neil Pliskin: Neuro-psychologist

On January 15, 2002, Dr. Neil Pliskin, performed a neuropsychological screening evaluation of Claimant's intellectual functioning. R. 652. On the WAIS-III, she obtained a full scale IQ score of 63. R. 653. This placed her in the mild mental retardation range, and in the "lowest one percent of other individuals her age." R. 653. On the Wide Range Achievement Test-Third Edition ( "WRAT-3"), Claimant scored at the fifth grade level of vocabulary word recognition, the fourth grade level for both spelling and arithmetic, and the third grade level for reading comprehension. R. 653. Dr. Pliskin found that these scores "suggest that she is virtually unable to read or comprehend written material," and that "she will exhibit strong limitations functioning in life domains requiring reading, math, reasoning, and coping skills." R. 653. He found that the results of these tests were valid, but noted that "because of her weariness and preoccupation with current life difficulties on the day of testing, her performance may somewhat underestimate her optimal level of functioning." R. 653. He also noted that she suffered from severe depression, and was at a "significant risk for suicidal ideation." R. 653. He believed that the Claimant was in need of treatment for her depression, and that she would benefit from specific job skill training. R. 654.

## C. HEARING TESTIMONY

### 1. Claimant's Hearing Testimony

The Claimant was born in Arkansas in 1959. R. 38. She is a single woman with two teenage sons. R. 38. At the time of the hearing she received public aid. R. 37. Her alleged

onset of disability is March 29, 1989. R. 78. She has not worked since 1989. R. 39. She was last insured in 1994. R. 335.

Claimant is a high school graduate, R. 38, whose school did not offer special education classes. R. 426, 428. In 11th grade, her math class "consisted of adding and subtracting." R. 427. Claimant repeated grades, R. 381, and was never required to read a book. R. 427. After high school she began community college, but dropped out after six months because of kidney problems. R. 56.

From 1983-1989, the Claimant worked as a machine operator and supervisor at a bindery. R. 40, 109. She believes that she may have had a previous job, but she does not "remember much about it". R. 114. At the bindery, she operated the binder machines by using hand controls and a left foot pedal. R. 40, 377. In 1995, she reported that she walked or stood for eight hours a day, sat one hour, lifted 25 pounds frequently and 50 pounds occasionally. R. 110. From 1986-89 she was a supervisor of six to eight binders. R. 376-78. Her job included setting up the machines, training the binders to use the machines, and writing out tickets or receipts. R. 376. In 1998, she recounted that her job as a supervisor of eight to ten workers included writing reports, preparing time and production sheets and making sure that her subordinates met their quotas. R. 745.

In 1989, the Claimant stopped working after hurting her knee on a machine at work. R. 41. She then had arthroscopic surgery on her left knee. R. 203. Claimant testified that

within six months of the operation her condition began to worsen and it has not improved. R. 48.

Claimant has trouble sleeping and watches TV all day. R. 51. She only leaves her home twice a month– to buy groceries, cash her welfare check, and go to the doctor. R. 51.

**2. Expert Medical Testimony on Claimant's Physical Condition**

**a. Dr. William Newman: Orthopedic Surgeon**

Dr. William Newman, an orthopedic surgeon, testified as an impartial expert witness at four of the Claimant's hearings. He testified on January 3, 1997, that in her current condition the Claimant could perform light work, and stand or walk for half a day with breaks. R. 73-74. He further testified that she could repetitively use a light foot pedal and could lift and carry light amounts. R. 73-74.

In April 1997, after reviewing additional medical evidence, Dr. Newman wrote that the Claimant's knee pathology would not preclude her from standing or walking for a full day. R. 285. He also noted that the medical evidence confirmed that the Claimant did not have a nerve deficit in her right upper extremity. R. 285. On July 21, 2000, Dr. Newman testified that the objective evidence showed that the Claimant's medical impairments would limit her ability to squat, kneel, crawl, climb and use heavy foot pedals, but that they would allow her to stand or walk for six hours of an eight hour day with "no problem." R. 342-5. He also found that she could flex her elbow 120 degrees. R. 345.

On November 13, 2001, Dr. Newman testified that the Claimant's knee pathology showed that she could only walk or stand for four hours out of an eight hour work day, could frequently lift ten pounds, and could occasionally lift twenty pounds. R. 365-69.

On July 2, 2002, Dr. Newman testified as an expert in orthopedics. R. 399. He testified that the Claimant's mild arthritis in both knees would limit her to standing or walking only four hours per eight hour day, and would only allow for occasional squatting and kneeling, with no use of heavy foot pedals. R. 408-9. He found that she could frequently lift ten pounds, occasionally lift twenty pounds, and could stand for no more than one hour at a time. R. 408, 411.

### b. Dr. Irwin Feinberg: Orthopedic Surgeon

On March 10, 2000, Dr. Irwin Feinberg testified as a medical expert in orthopedics. R. 324, 476. He testified that the only medically determinable impairment that could cause any of the Claimant's symptoms were her knee problems. He recommended a special type of x-ray be taken. R. 326.

### c. Dr. James McKenna: Physician of Internal Medicine

On March 10, 2000, Dr. James McKenna, a specialist in pulmonary disease and internal medicine, testified that the Claimant's sickle cell trait did not significantly affect the joints. R. 326-7.

### d. Dr. Earnest Mond: Physician of Internal Medicine

On July 21, 2000, Dr. Earnest Mond, a doctor of internal medicine, testified that the only effect of having a sickle cell trait was that one could potentially pass the trait onto one's children. R. 352. He was not aware of it being able to cause arthralgia or joint pain. R. 352. He studied an ultra-sound of her kidneys from 1995, and found them to be normal. R. 352. He also noted that her hypertension was under control, and that she had normal pulmonary function. R. 353.

### e. Dr. Maurice Gore: Physician of Internal Medicine

On November 13, 2001, Dr. Maurice Gore, testified as an expert in internal medicine that Claimant's hypertension was under control and that her pulmonary function was "not abnormal." R. 369-72.

### f. Dr. Irving Zitman: Physician of Internal Medicine

On July 2, 2002, Dr. Irving Zitman testified as an expert in internal medicine that there was no functional implication to the Claimant having the sickle cell trait. R. 398. He found her hypertension to be "well controlled," and found no medically determinable pulmonary disease established by the Claimant's medical record. R. 399.

### 3. Expert Medical Testimony on Claimant's Mental Condition

### a. Dr. Richard Zaloudek: Expert Witness in Psychiatry

On July 21, 2000, Dr. Richard Zaloudek, testified as an expert witness in psychiatry.

R. 356, 590. He stated that he could not determine if Claimant was mentally retarded based on the exam conducted by Dr. Knopf. R. 356. To make that determination he would need information regarding her "intellectual deficits in the developmental period as well as also establishing that there [was] consistent adaptive dysfunction." R. 356. He agreed with Dr. Knopf's assertion that the MMPI-2 results were invalid. R. 358. He also found significant evidence in Dr. Knopf's report to support the Claimant's assertion that she suffered from severe anxiety and depression. R. 358. He thought that the WAIS-III score given by Dr. Knopf in April, 2000 was valid. R. 360.

### b. Dr. Eric Ostrov: Expert Witness in Psychology

On November 13, 2001, Eric Ostrov, Ph.D. testified as an expert in psychology. R. 372, 710. He testified that the record was insufficient for him to opine on the Claimant's mental condition. R. 373. He found Dr. Knopf's psychological report outdated, no evidence in the record of the Claimant being retarded in her youth, and varied descriptions as to the extent of the Claimant's drinking and psychological state. R. 373-4. He felt that even if the WAIS-III was valid, her score might be attributable to "an organic condition caused by the extent of drinking to which she attested to over a nine year period." R. 374. Dr. Ostrov recommended that the Claimant be given the Luria-Nebraska Neuropsychological Battery in order to resolve these issues. R. 374.

On February 15, 2002, after reviewing Dr. Smith's psychological report, Dr. Ostrov wrote in a letter to the ALJ that the Claimant's "irritability, resistance, and low frustration

tolerance", which Dr. Smith noted, "raise[d] questions about [the Claimant's] motivation and cooperation." R. 650. Dr. Ostrov further noted that Dr. Smith did not "adequately address the possibility of malingering," nor did he provide any examples of the Claimant's "alleged [brain] deficits." R. 650. Given that the issue of malingering had also been raised on her MMPI-2, he felt that Dr. Smith should have administered a battery of tests to "effectively address the issue of malingering." R. 651.

On July 2, 2002, Dr. Ostrov testified that he found many inconsistencies in the record about the Claimant's level of functioning. R. 413. For example, he found tests showing Claimant as mentally retarded and only capable of reading at a third grade level, to be inconsistent with her being a high school graduate and her job history. R. 413. He found nothing in the records from her examination to clarify this discrepancy. R. 413. He noted that the scores from her two IQ tests were consistent, but found no evidence in the record of the concomitant deficit and adaptive functioning contemplated for in the diagnosis of mental retardation. R. 414-5. Dr. Ostrov testified that the record revealed that the Claimant could bathe and dress herself, cook and take public transportation by herself. R. 415. He further testified that a person with her IQ would be functioning at a nine year old level, and that this would be noticeable in a conversation, but nothing in the record supported this idea. R. 415-6. After hearing the Claimant's testimony and reviewing the extensive medical history, Dr. Ostrov concluded that he would not consider her mentally retarded, but rather found that she was of borderline to low average intellectual functioning. R. 429.

Dr. Ostrov found nothing in the record to establish that the Claimant suffered from severe depression, because it documented neither "specific symptoms, [or] a history of symptoms." R. 417. The record did not show that the Claimant suffered from severe depression. 417-18. He found that her history of Prozac was consistent with panic attacks, but noted that since her panic attacks were triggered by her children, they were unlikely to impact her at work. R. 418, 421, 424.

Dr. Ostrov testified that the Claimant's MMPI-2 was "entirely invalid," R. 718, and that the record neither proved nor disproved malingering. R. 425. He noted that her ability to consistently answer questions in the negative direction indicated that she was able to understand every single item on the test. R. 419. He found her comprehension significant, since the test was given at a reading comprehension level of between fifth and seventh grade. R. 419.

Dr. Ostrov acknowledged that his analysis of her mental condition differed from the findings of the others. R. 432. He opined that Dr. Smith's results were not detailed enough to be valid, because it was possible that the results of the Luria-Nebraska reflected a lack of performance, not mental retardation. R. 432. He also found that the doctors who diagnosed her as having depression or panic attacks, based this analysis on reports by the Claimant and not on their own observations. R. 433. To make judgments that one is suffering from either ailment, Dr. Ostrov believed that the psychiatrist or psychologist must document his reasoning. R. 433.

Dr. Ostrov opined that the Claimant, while not able to perform complex tasks, could perform simple tasks of up to three steps. R. 431.

### 4. Vocational Expert: Dr. Richard Haverman

On July 2, 2002, Vocational Expert, Dr. Richard Haverman, testified that given the Claimant's age, education level, work experience, the physical limits given by Dr. Newman, and Dr. Ostrov's caveat that the Claimant should be limited to one, two, and three step tasks, the Claimant would still be able to perform 20,000 sedentary jobs in the Chicago metropolitan area, and 21,000 light jobs in the Chicago metropolitan area. R. 434-39. He testified that each of these jobs existed in several regions of the national economy. R. 439.

## D. DECISION OF THE ALJ

The ALJ's decision followed the five-step process set forth in 20 C.F.R. § 404.1520. At step one, he found that the Claimant had not engaged in substantial gainful activity. R. 317. At step two, he found that the Claimant's ailments were severe, given her history of arthroscopic surgeries on both knees, arthritis of both knees, history of sickle cell trait, history of hypertension without end organ damage, history of surgeries for other acute conditions, and borderline intellectual functioning with likely learning disabilities. R. 317. At step three, he found that the impairments alone or in combination did not meet or equal a listed impairment. R. 317. The Claimant did not meet Listing 1.02 because she had not produced any medical evidence to support her claim. R. 313. He determined that the Claimant did not meet Listing 12.05C because neither of her IQ scores were valid because

of her educational and vocational history and because she did not depend on others for her personal care. R. 314.

At step four, the ALJ found that the Claimant could not perform any past relevant work because she could only stand and/or walk for four hours of an eight hour day, in maximum of one-hour increments, and could only lift ten pounds frequently and twenty pounds occasionally. R. 317. His findings were based on the testimony of Dr. Newman, as his testimony was the most consistent with the record as a whole. R. 315.

At step five, the ALJ found that the Commissioner had established that jobs existed in significant numbers in the national economy which the Claimant could perform. R. 316. The ALJ found Claimant able to perform the jobs indicated by the VE, because even if the Claimant did require a cane to ambulate, he found no evidence in the record that the Claimant had a useless dominant upper extremity. R. 316. He concluded that the Claimant was not disabled. R. 316-17.

## III. LEGAL STANDARDS

### A. STANDARD OF REVIEW

Judicial review of the Commissioner's final decision is governed by 42 U.S.C. 405(g), which provides that the findings of the ALJ are conclusive if supported by substantial evidence. 42 U.S.C. 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)(citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). A mere scintilla of

evidence is not enough. *Id.* Even if there is adequate evidence in the record to support the decision, the findings will not be upheld if the "reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996).

A reviewing court may not re-evaluate the facts, re-weigh the evidence, or substitute its own judgment for that of the ALJ. *Diaz*, 55 F.3d at 305-06. Thus, judicial review is limited to determining whether there is substantial evidence to support the findings. *Id.; Scivally v. Sullivan*, 966 F.2d 1070, 1075 (7th Cir. 1992). The reviewing court has the power to enter a judgment "affirming, modifying, or reversing the decision of the Secretary, with or without remanding the case for a rehearing." 42 U.S.C. 405(g).

## B. DISABILITY STANDARD

A claimant is eligible for disability benefits when he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A).

The Commissioner uses a five-step sequential process in order to determine if a claimant is disabled. 20 C.F.R. §§ 404.1520(a), 416.920(a). The sequential evaluation ends if the ALJ, at any step of the process, finds that the claimant is not disabled. *Id.* The ALJ must inquire: (1) whether the claimant is working and the work is substantial gainful activity, (2) whether the claimant's impairment is severe, (3) whether the impairments meet or equal

a listed impairment in 20 C.F.R., pt. 404, subpt. P, Appendix 1, 20 C.F.R., pt. 416, subpt. P, Appendix 1, (4) whether the claimant is able to perform his past relevant work, and (5) whether the claimant's age, education, and past relevant work experience in reference to his RFC, enables him to do other work. 20 C.F.R. §§ 404.1520(b-f), 416.920(b-f) (2003). The RFC is defined as the most that an individual can do, after considering the effects of physical and mental limitations that affect her ability to perform work-related activities. 20 C.F.R. § 404.1545. The burden of proof is on the claimant through step four, and shifts to the Commissioner only at step five. *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000).

Claimant raises two problems with the Commissioner's decision: 1) the ALJ failed to give appropriate weight to the opinions of the treating and examining physicians, and 2) the ALJ erred in finding that Claimant did not meet or equal the requirements of Listing 1.02, 12.05 and 12.02. Each will be discussed in turn

## IV. ANALYSIS

### A. THE ALJ DID NOT ERR IN ANALYZING THE MEDICAL EVIDENCE AND RELYING UPON THE MEDICAL EXPERTS WHO REVIEWED CLAIMANT'S MEDICAL HISTORY.

The Claimant alleged that the ALJ erred by failing to address a treating physician's 1997 opinion that Claimant would be limited to only sedentary work. R. 290-91. In analyzing her physical condition, the ALJ reviewed the testimony of eight different medical experts, the reports by consultative physicians, and the results of numerous medical examinations. The ALJ accurately summarized the medical opinions and objective evidence and decided to give greatest weight to the orthopedic experts who agreed that Claimant could

work.

Likewise, the ALJ ordered two psychological evaluations and took testimony from experts of psychiatry and psychology in order to fully develop the record concerning the Claimant's cognitive functioning. While the findings of the evaluations placed her in the mentally retarded range, the ALJ had substantial evidence in finding that she was not mentally retarded, given the scores were inconsistent with Claimant's vocational history, educational background and documented ability to care for herself, the psychological evaluation reports noted the possibility of malingering, and the scores contradicted testimony by the psychological expert that the Claimant was most likely of borderline to low average intelligence.

Lastly, in analyzing the Claimant's alleged severe depression, the ALJ reviewed reports by the examining psychologists, which while finding the Claimant to be depressed based on her reported symptoms, contained no objective evidence that she suffered from depression. The ALJ in coming to a conclusion supported by expert testimony and uncontradicted by any objective findings in the record, had substantial evidence to find that the Claimant did not have severe depression.

## 1. The ALJ Properly Relied on the Testimony of Dr. Newman.

The ALJ did not err in holding that substantial evidence did not support the RFC evaluation of her treating physician. A treating physician is not given controlling weight if the medical opinion is not "well-supported by medically acceptable clinical and laboratory

diagnostic techniques, and is. . . inconsistent with other substantial evidence in [the] record." 20 C.F.R. § 416.927(d)(2); *Henderson v. Apfel*, 179 F.3d 507, 514 (7th. Cir 1999) ("ALJ need not give controlling weight to a treating physician's opinion if it is not supported by objective clinical findings.").

The ALJ's decision was supported by the testimony of every medical expert and by all objective medical tests, both past and present. The ALJ's process of evaluating the medical testimony followed the guidelines of 20 C.F.R. § 404.1527. The ALJ found that the analysis by Dr. Newman was the most informed and consistent with the record. The ALJ did not make an independent medical conclusion in coming to this decision, nor did he merely make a blanket declaration as to the merit of the Claimant's assertions. *Herron v. Shalala*, 19 F.3d 329, 334 (7th Cir. 1994) (citing *Ray v. Bowen*, 843 F.2d 998, 1002 (7th Cir. 1988)("ALJ must articulate at some minimal level his analysis of the evidence."). Rather, he analyzed the record and the medical testimony from the hearing. The reports by all of the consultative examiners, and the test results, were all consistent with Dr. Newman's analysis. In contrast, no evidence in the record supported the findings documented by Dr. Tabayoyong, the Claimant's treating physician, on the RFC he conducted five years before the hearing. The ALJ created a "logical bridge" between his opinion and the record. *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002). The ALJ properly adopted Dr. Newman's final and most restrictive opinion.

## 2. The ALJ Had Substantial Evidence in Finding that the Claimant Was Not Mentally Retarded.

The ALJ did not err in finding that the Claimant's IQ scores were inconsistent with the record, as nothing in the record or the expert testimony supported the scores validity. An ALJ is correct in finding that an IQ score is invalid when it is not consistent with the record. *Maggard v. Apfel*, 167 F.3d 376, 380 (7th Cir. 1999) (IQ test found invalid as contradicted prior psychiatric evidence, and the Claimant told the test administrator that he had not eaten for two days preceding tests, and had been drinking until two a.m. the night before test); *Strunk v. Heckler*, 732 F.2d 1357, 1360-61 (7th Cir. 1984) (Given conflicting evidence in the record, there is substantial evidence to support ALJ's conclusion that Claimant not mentally retarded).

In order to create a full and fair record of the Claimant's cognitive functioning, the ALJ ordered multiple psychological evaluations and heard the testimony of expert witnesses. *Thompson v. Sullivan*, 933 F.2d 581, 585 (7th Cir. 1991) (Duty of ALJ to develop full and fair record).

The Claimant is a high school graduate who completed a semester of community college. At her last job she supervised eight to ten workers, gave instructions and frequently filled out forms and receipts. She has lived independently for the entirety of her adult life, has raised two children, and nothing in the record suggests that the her adaptive functioning was impaired or that she had any concomitant deficits.

Moreover, the testimony of Dr. Ostrov further validates that the Claimant was not mentally retarded. Dr. Ostrov observed the Claimant at multiple hearings, and unlike the psychologists who examined her, he was privy to the whole record. This allowed him to contextualize the Claimant's evaluations, and look at them in a more reasoned way than the psychologists who based their findings of mental retardation on the test scores alone. *Garrison v. Heckler*, 765 F.2d 710, 713 (7th Cir. 1985) (Specialist's ability to add "new information or perspective" may be considered substantial evidence). Dr. Ostrov found the Claimant's vocational history, educational status, ability to live independently, and level of articulation and understanding to be most consistent with a person of borderline to low average intelligence. This conclusion finds further support in that the psychologists who examined the Claimant noted the possibility that her scores were artificially low due to a number of potential factors, including malingering. The ALJ's decision is supported by the Claimant's documented level of functioning and Dr. Ostrov's thoughtful opinion based on the totality of the evidence.

### 3. Substantial Evidence Supports the ALJ's Conclusion that the Claimant Was Not Severely Depressed.

The ALJ correctly dismissed the Claimant's assertion that she had severe depression, as this claim was not supported by objective evidence or expert testimony. An ALJ may not "make [his] own independent medical findings," which "disregard[] . . . objective evidence" of the Claimant's situation. *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996). In this case, the ALJ did not disregard any objective evidence regarding the Claimant's depression

because there was no objective evidence. The results of the MMPI-2, the one objective exam that the Claimant was given, were found to be invalid, due to probable malingering, by both Dr. Knopf, who administered it, and by Drs. Zaloudek and Ostrov, the expert witnesses. The only evidence presented to the ALJ was the finding of the Claimant's examiners that after hearing the Claimant tell her symptoms they had found her to be severely depressed. The examiners did not provide objective evidence or a documented history of the scope of the Claimant's alleged depression. The ALJ held these findings by the examiners to be insufficient. He did not find the Claimant to be a reliable witness, given her possible malingering on the MMPI-2 and based on how he had observed her in the multiple hearings which he had presided over during a five-year period.

The ALJ did not err in partially relying on his observations in making his decision, because given the subjective nature of the evidence, he could not believe her claims of depression if he could not find her credible. *Herron*, 19 F.3d at 335. (Stating that "credibility determinations involve inarticulable elements" that do not appear in a transcript, ALJ in best position to make credibility determinations, and these determinations not overturned on appeal "so long as they find some support in record and are not patently wrong"); *Kelley v. Sullivan*, 890 F.2d 961, 964 (7th Cir. 1989) (quoting Whitney v. Schweiker, 695 F.2d 784, 788 (7th Cir. 1982)) ("ALJ does not commit impropriety when he relies on his own observations during a hearing concerning the severity of a claimant's claim. Such observations are credibility determinations and are entitled to considerable weight."). In the

absence of any objective evidence to support the Claimant's claims of depression, the ALJ did not err.

## B. CLAIMANT DID NOT MEET HER BURDEN TO SHOW THAT HER IMPAIRMENT MET LISTINGS 1.02, 12.05C and 12.02.

The ALJ correctly found that the Claimant did not meet listing 1.02, 12.05C and 12.02, because the Claimant failed to present sufficient evidence that she met or equaled any of these listings. To meet a listed impairment, the Claimant must satisfy all of the criteria of the impairment. *Maggard v. Apfel*, 167 F. 3d at 380. Moreover, the claimant bears the burden of showing that her condition meets or equals a listed impairment. *Id.*

The ALJ did not commit legal error at step two of the evaluation when he found that the Claimant's impairment did not meet Listing 1.02. Listing 1.02 provides:

Major dysfunction of a joint(s) (due to any cause): Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:

A. Involvement of one major peripheral weight bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively as defined in 1.00(B)(2)(b)[1]

---

[1] Listing 1.00B2b(2) provides:
To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. Individuals must have the ability to travel without companion assistance to and from a place of employment... Examples of ineffective ambulation include. . . the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. . ."

20 C.F.R. pt 404, subpt. P, App. 1. In his decision, the ALJ summarized the medical evidence before holding that none of the Claimant's alleged impairments met or equaled the listing's requirements. R. 313. To the extent the ALJ based his decision on the objective findings of the medical record, he did not err. *Herron,* 19 F.3d at 334.

The ALJ did not err in finding that the Claimant did not meet listing 12.05. To meet the listing the Claimant must show that she meets all of the requirements of 12.05 and its sub-parts, including the requirement that the impairment onset was prior to age 22. This age requirement is a requisite component of 20 C.F.R. § 404, Subpart P, Appendix 1. Listing 12.05 provides:

> Mental Retardation refers to significantly sub-average general intellectual functions with deficits in adaptive functioning initially manifested during the developmental period; i.e. the evidence demonstrated or supports onset of the impairment before age 22.

> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied

> C. A valid verbal, performance, of full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation on function.

20 C.F.R. pt 404, subpt. P, App. 1. The Claimant fails to satisfy Listing 12.05 because the Claimant provided no evidence to support a claim that retardation existed before age 22, and because her history as a high school graduate, former supervisor of 8-10 individuals, and mother of two who had lived independently for the totality of her adult life all contradict a finding of mental retardation.

The ALJ did not explicitly write on the merits of Listing 12.02, and the record does not contain substantial evidence showing that the ALJ erred by not finding that the Claimant met the elements of Listing 12.02. Nevertheless, the Claimant asserts that she met Listing 12.02. The listing provides:

> Organic Mental Disorders: Psychological or behavioral abnormalities associated with a dysfunction of the brain. History and physical examination or laboratory tests demonstrate the presence of a specific organic factor judged to be etiologically related to the abnormal mental state and loss of previously acquired functional abilities. The required level of severity for these disorders is met when the requirements in both A and B are satisfied . . .
>
> A. Demonstration of loss of specific cognitive abilities or affective changes and the medically documented persistence of at least one of the following . . .
>
> 7. Loss of measured intellectual ability of at least 15 I.Q. points from premorbid levels or overall impairment index clearly within the severely impaired range on neuropsychological testing, e.g., the Luria-Nebraska. . . .

20 C.F.R. pt 404, subpt. P, App. 1. However, the Claimant does not meet this listing because she failed to provide any evidence that her condition had deteriorated. *Young v. Sec'y Health and Human Servs*, 957 F.2d, 386, 388, 389 (7th Cir. 1992). (claimant demonstrated loss of specific cognitive abilities by showing the deterioration caused by medicine and surgery to control epilepsy). The ALJ fulfilled his duty to develop a full and fair record by ordering the administration of the Luria-Nebraska and numerous other medical examinations. *See Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000) (ALJ erred in not ordering an objective medical examination, which would be probative as to the Claimant's eligibility to meet a listing). As the "Claimant ha[d] the burden to prove disability", *Id.*; and as nothing in the record

suggested that the Claimant's level of cognitive functioning had deteriorated, Claimant's argument that she met Listing 12.02 can not prevail.

## V. CONCLUSION

The Claimant's case has been stretched out over a period of five years. The ALJ called numerous expert witness and ordered multiple physical and mental examinations, all in order to develop a fair and full record. In formulating his opinion, the ALJ carefully sifted through the record, analyzed the findings, and built a logical bridge between the record and his opinion. The decision of the ALJ is supported by substantial evidence. **The Commissioner's motion for summary judgment is granted and the Claimant's motion for summary judgment is denied. The decision of the ALJ is affirmed.**

**SO ORDERED THIS 1st DAY OF JULY, 2003.**

_Morton Denlow_

**MORTON DENLOW**
**United States Magistrate Judge**

**Copies mailed to:**

Mary Elizabeth Kopko
McBreen and Kopko
1525 East 53rd Street, Suite 709
Chicago, Il 60615

Malinda Hamann
Special Assistant United States Attorney
200 West Adams Street, 30th Floor
Chicago, IL 60606

Attorney for the Plaintiff

Attorney for Defendant